AMERICAN NATIONAL BANK v. S. T. WADE, et al.

Western Section. July 1, 1930.

368

Bass, Berry & Sims, of Nashville, and W. M. Miles, of Union City, for appellant.

W. E. Hudgins, E. H. Lannom, Fenner Heathcock and Pierce & Fry, all of Union City, for appellees.

HEISKELL, J. The bill of complaint in this cause was filed in the Chancery Court of Obion County, Tennessee, on June 13, 1927, by the American National Bank of Nashville, Tennessee, against S. T. Wade, W. M. Warterfield, individually and as trustee, Reagor Motlow as trustee, The Union Joint Stock Land Bank of Louisville, Ky., and Walter Howell, trustee, the purpose and aim of which bill was to have the Chancellor declare that the release by W. M. Warterfield of the vendor's lien upon the tract of land described in the bill to secure the series of ten notes described in the deed from W. M. Warterfield and wife to S. T. Wade was null and void and ineffective in so far as the last seven notes of said series held by complainant were concerned. The enforcement of the vendor's lien by a judgment upon said seven notes and the sale of the land was the incidental relief sought by complainant.

An answer was filed by W. M. Warterfield and an answer and cross-bill was filed by The Union Joint Stock Land Bank and Walter Howell, Trustee, the defense made being that at the time of the release of said lien Warterfield was in possession of the notes by consent of the American National Bank with authority to release the lien thereof so as to permit The Union Joint Stock Land Bank to make a loan upon said tract of land to retire the matured encumbrance superior to the series of vendor's lien notes and other pressing claims against the property. The Union Joint Stock Land Bank and Walter Howell, Trustee, in their cross-bill sought to have a decree of the Court declaring their deed of trust to be a first lien upon said tract of land and ordering the land sold under

the terms of said deed of trust to satisfy the indebtedness secured therein, the indebtedness having matured by a default in the payment of a part thereof as provided in said deed of trust.

Issue having been joined along the line above mentioned, proof was taken and the case heard before the Chancellor, when the Chancellor adjudged and decreed that said release in so far as it affected the lien of the last seven of said series of vendor's lien notes held by complainant was null and void. The decree awarded complainant a personal judgment on the notes against Wade and Warterfield and ordered a sale of the land under the vendor's lien. Under this decree the Chancellor held that the Union Joint Stock Land Bank was subrogated to a certain extent by virtue of the payment of the first lien, certain taxes and a note upon which the first three notes of the series of vendor's lien notes were pledged.

The defendant, Union Joint Stock Land Bank of Louisville, Ky., excepted to this action of the court and prayed an appeal therefrom to this Court. The appeal was granted upon condition that a good and sufficient appeal bond be given in double the amount of the personal judgment recovered by complainant on the notes against Wade and Warterfield, the Chancellor being of the opinion that the only appeal he could grant would be a general appeal from the whole decree.

Feeling that it could not afford to perfect its appeal under these circumstances, The Union Joint Stock Land Bank has brought this cause before this court by petition for writ of error, in order that it may present the record for review, and has assigned errors.

On February 27, 1920, W. M. Warterfield and wife, Jennie Warterfield, conveyed to S. T. Wade the lands described in the record for and in consideration of $1,750 cash, the assumption of the payment of a note for $1,462.50 executed by W. M. Warterfield to W. M. Stalcup, then held by E. H. Lannom, Administrator of the estate of D. M. Pearce, deceased, which was a first lien upon 26 acres of the land conveyed, and the execution and delivery by the said Wade to the said Warterfield of nine notes in the sum of $1,272.12 each and one note in the sum of $1,272.14, due and payable serially in from one to ten years after date, with a provision contained therein that default in the payment of any one of the series of notes should make the entire series due and payable, an express vendor's lien being retained in the deed to secure the payment of this series of notes as well as the Stalcup note. This deed was recorded in the Register's office of Obion County, Tennessee, in Book 8 Q at pages 495-496.

At the time of the above-mentioned conveyance W. M. Warterfield was in the grain business in Nashville, Tennessee, operating as the Neil-Shoffner Grain Company. The banking business of the

firm was being handled through the Cumberland Valley National Bank which was later consolidated and merged into the American National Bank, the complainant below. At this time the Neil-Shoffner Grain Company was in good shape financially. However, for the protection of the firm's account, W. M. Warterfield voluntarily deposited with the Cumberland Valley National Bank as general collateral, the entire series of S. T. Wade vendor lien notes as well as other notes including nine notes in the sum of $800 each and one note for $866.28 executed by Bruce Kirkman and payable to the order of Warterfield secured by a vendor's lien retained in a deed from W. M. Warterfield and wife to Bruce Kirkman covering certain lands adjoining the S. T. Wade land in Obion County, Tennessee, these notes being of date February 27, 1920, the date of the deed, and being inferior and subordinate to a prior encumbrance in the sum of $4,000 held at the time by the estate of H. A. Compton.

At some later date the first four of the Wade notes were returned by the Cumberland Valley National Bank to Warterfield. However, it appears that the fourth of the series was again deposited as collateral with said bank.

In 1920 or 1921, the Cumberland Valley National Bank was merged with the American National Bank which took over its business and securities. The affairs of the Neil-Shoffner Grain Co., prosperous at first, became involved, owing to losses sustained, and Warterfield became considerably indebted to the complainant bank. During this time, say 1921 to 1923, Wade and Kirkman were having a difficult time with their farming operations, neither being able to pay the first mortgages on their lands or the vendor lien notes. They were being hard pressed to be able to pay the taxes on their land and the interest on the first mortgages. The situation did not suit the holders of the first mortgages inasmuch as both notes were held by the administrators of estates who were anxious to make settlements. They were accordingly insisting upon the payment of these first mortgages.

In the winter and spring of 1922 and 1923, Wade and Kirkman were behind with interest on their notes and with taxes on the land and had failed to pay the matured notes. The holders of the first liens were pressing for payment. In fact, E. H. Lannom, administrator of D. M. Pearce who held the Stalcup note, the first lien on the Wade land, had filed a bill to foreclose, in November, 1922.

The three Wade notes withdrawn by Warterfield had been hypothecated with the Third National Bank of Union City to secure a note for $2500 executed by Warterfield and while this note had been renewed, yet the holder was pressing for payment.

This was the situation in the spring of 1923 just preceding the release by Warterfield of the lien of all these notes of Wade and Kirkman, on May 12, 1923. We may as well state here, that while the record is encumbered with profuse and reiterated objections to testimony as to the release of the Kirkman notes, or to the Kirkman transaction, and while those notes are not involved in this suit, yet the two transactions ars so connected in matters of evidence bearing on the controversy in this case as to make it impossible to leave the Kirkman transaction out of consideration.

The situation then being as stated, the question to be determined is, was Warterfield authorized to release the lien of the seven Wade notes and negotiate the $5,000 loan on the Wade land secured by a first mortgage, or was this a fraud on the complainant bank, done without the knowledge and consent of said bank and as to it, absolutely null and void?

Warterfield testified that he explained the situation to Alexander, who handled the matter for the bank. That he recommended to Alexander that loans be procured on both the Wade and Kirkman farms in the names of Wade and Kirkman, the proceeds to be used in paying off the first liens and the threatening Third National Bank note of $2500. He says that he also suggested later that the bank take over the land, eliminating Wade and Kirkman entirely. He says that Alexander agreed to all this and that thereupon he entered into negotiations with the Union Joint Stock Land Bank, with the result that a loan of $5,000 was secured on the Wade land and $4400 on the Kirkman land. He says that Alexander let him have possession of the seven notes for the purpose of making said release in order to secure the loan. That he got these notes in person at the bank in Nashville and returned them afterwards when in Nashville.

The suit of the complainant bank is necessarily a denial of this testimony of Warterfield. The evidence as to what took place between Warterfield and the American Bank depends in the first instance entirely upon the testimony of Warterfield and Alexander, and then there are to be considered certain corroborations and contradictions.

There is no controversy as to the situation set out above, in the spring of 1923, Wade and Kirkman had ceased to function. A foreclosure suit was pending on the Stalcup note and the $4,000 first lien on the Kirkman land was threatening to take the same shape. The Third National Bank note of $2500 secured by three of the ten Wade notes, two of them past due, was being pressed. Warterfield says, in substance, that something had to be done and that as stated he went and talked with Alexander about it. His testimony seems to be a plain straightforward statement of facts.

Let us look at the testimony of Alexander. Asked on cross-examination to describe the collateral Warterfield had pledged say in 1920 or 1921, he says: "I must admit that the collateral that he pledged there was more or less always confused in my mind as to what different pieces of property that the different notes were on . . . ."

Cross-examined as to the first liens on the Kirkman and Wade farms, he says:

"Q. Mr. Alexander, those Kirkman notes that you held as collateral were, at the time they were pledged, first vendor's lien notes against the land, or were they second lien notes, according to your understanding? A. According to my understanding, they were second lien notes and that there was a first mortgage or first lien against the property of four thousand dollars, or around that figure, at the time we got these notes from Mr. Warterfield.

"Q. Do you recall who was the holder of that first mortgage or first lien? A. No, I don't recall; I never knew, so far as I remember.

"Q. Have you any recollection when that first mortgage in the Kirkman matter matured or become due? A. No, I have no recollection.

"Q. I believe there was also a prior lien to the notes which you held against the S. T. Wade property, was there not? A. It was my understanding that there was a lien of around twelve or fifteen hundred dollars, that is my recollection.

"Q. Do you know when that note matured? A. No, I do not.

"Q. To refresh your recollection by referring to the file of correspondence between you and Mr. Warterfield if you care to, don't you know that a bill was filed by the holder of the first lien note in the sum of about $1462 to foreclose his lien? A. I may have been notified of that, but I have no recollection of it.

"Q. Had you and Mr. Warterfield ever talked together about readjusting these lien debts so as to take care of matured obligations which had priority to your notes? A. Mr. Warterfield and myself discussed these matters frequently, always with the view of trying to get the Bank's paper in better position and always with the view of trying to take care of our obligation. I don't remember, of course, the details of our discussion."

The burden of proof is upon the bank to show that Warterfield's act was null and void. Did he tell Alexander about the suit to foreclose on the Stalcup note? He says positively he did. Alexander says he does not remember. If we hold that Alexander was not

notified, then his non-recollection must be held to overcome the positive testimony of Warterfield. Besides, it was the natural and reasonable thing for Warterfield to do to notify Alexander of danger and if he did give notice of the suit brought and others threatened, it was the natural and reasonable thing for Alexander to authorize him to do something to save the situation. It is clear from all the evidence that Alexander relied on Warterfield and trusted him. He expected Warterfield to look after the property. It is clear that Warterfield was optimistic in 1923, expecting to pay off his debts and hoping to make this property help. He was interested in saving it.

The most remarkable part of this conflict of testimony is that Warterfield testifies that he had the seven notes in his possession at the time he released the lien. He knew of course, that he could not negotiate a loan with the land bank except by giving a first lien. He says he got the notes and showed them to Hudgins who represented the Union Joint Stock Land Bank. Alexander insists that the notes were not out of the possession of his bank. Here again, if Alexander agreed to the scheme to obtain a loan to prevent foreclosure, it was natural enough for him to allow Warterfield to take the notes for the purpose of releasing the liens, and if he forgot about notice of the threatened foreclosures, it was not strange that he should forget about the temporary delivery of the notes to Warterfield. But aside from·this, we do not think the. testimony of Alexander on this point carries the burden of proof as against that of Warterfield. We take several excerpts from the testimony of Alexander:

"Q. Were those notes ever turned over to W. M. Warterfield for any purpose whatever or to any one else. for him? A. Not to my knowledge or recollection, or according to our records."

. . . . . . .

"Q. Did Mr. Warterfield ever discuss with you, or any one else connected with the bank officially, so far as you know, the matter of releasing these notes and the lien thereof? A. Not that I remember of or know, no, not certainly in the capacity that he did release them in, or in any capacity so far as I recollect.

"Q. Did you know of the execution of the mortgage by S. T. Wade to Walter Howell, Trustee, to secure the Union Joint Stock Land Bank in a loan of five thousand dollars, at or before the date of its execution and registration in May, 1923? A. I did not.

"Q. When did you first learn of this mortgage? A. As I stated before, at the time Mr. Wakefield went to Union City

and examined the records there and came back and notified me that this mortgage had been made.

"Q. Was that in May or June, 1926? A. That is my recollection, yes sir."

Alexander then says that he did not know of the release of the liens of the Wade and Kirkman notes until Wakefield went to Union City in May, 1926, and discovered and reported the facts. His attention is then called to certain letters written by him, among them the letter to Warterfield of February 6, 1926, a portion of which is as follows:

"Mr. W. M. Warterfield,                    Feb. 6, 1926.

"Union City, Tenn.

"Dear Sir:

"Am in receipt of yours of February 5th, complying with my telephone conversation of some days ago.

"I acknowledge receipt of the deeds to the property against which we hold notes, one the Kirkman land and the other the residence in Union City. Am returning herewith the deed to the Kirkman property as it does not appear to have been recorded. Please have this deed recorded and return to me together with the insurance papers mentioned in your letter, also deed to the other property."

The deposition then continues:

"Q. Mr. Alexander, do you now say that you never heard of those releases of the seven notes until Mr. Wakefield's visit to Union City? A. I answer that question as near as possible like I answered your question along that same line a while ago. I never knew that there had been any releases made on any of the property that we held notes against down there at Union City and that first mortgages were put against this property in which we did not participate or which was against our benefit or which was not favorable towards the American National Bank, until Mr. Wakefield went down there, and at that time I learned that those releases had been made and that these mortgages had been put on the property, and of course, I knew that we received no benefit, so far as I know from it.

"Q. Now, Mr. Alexander, that there may be no misunderstanding as to your answer, I would ask you again: Do you now say that you never had any knowledge or information that the seven Wade notes, which were a lien upon the land in Obion County, had been released until after Mr. Wakefield's visit to Union City? A. I will answer your question by repeating the answer that I made to your last question, and I will say further, that all the time that I was employed by the American National Bank I was trying to work in the interest of the Amer-

ican National Bank, and if I had agreed to the release of collateral security to our obligations and got nothing in return, except second lien notes which were in worse position than our first lien notes, then I have got no business holding my job in the bank.''

We regard this testimony as significant. When a witness instead of stating facts, assumes for himself a high character and says it would have been unworthy of his character to have acted as another witness swears positively he did, he dilutes his whole testimony. Besides, if he did not know about these threatened foreclosures, he ought to have known, 'and if he knew and did not concern himself to save the property, it was much more inefficient business conduct than to do as Warterfield says he did.

But this is not all: The letter of February 6, 1926, acknowledges the receipt of two deeds, one of which is a deed to the Kirkman land, reciting the deed of trust to the Union Joint Stock Land Bank. This deed is returned to Warterfield to be registered. This deed bears on its face the result of what Warterfield did, and was in pursuance of the plan which he says was agreed to by Alexander. It is made clear that the only reason why the Wade deed was not sent at the same time was that Wade had complicated his property by an assignment for the benefit of his creditors which had to be by consent of all the creditors put in the shape of a third lien on the land, and this had not been worked out. Another deed was enclosed to Alexander acknowledged in the letter of February 6, 1926, that is to the town property of Wade in Union City. This deed was retained by Alexander because it had been recorded. Then a third deed is referred to. The letter says: ''Please have this deed (the Kirkman deed) recorded and return to me, together with the insurance papers mentioned in your letter, also deed to the other property.'' This can mean only the Wade farm. There is an attempt to construe it to refer to the Wade town property, but he had the deed to this as shown a few lines above in the letter. So he was looking for the Wade deed as well as the Kirkman deed and all this carries with it the knowledge of the loan to pay off the liens which were threatening foreclosure and the completion of the scheme which Warterfield says was agreed on. This letter was more than three months before Wakefield went to Union City, yet Alexander insists that he first gained from Wakefield the information which was in the face of the deed to the Kirkman land. Nor is this all. Alexander's letter of February 6, 1926, acknowledges the receipt of Warterfield's letter of February 5th enclosing the deeds and speaking of other matters. The complainant bank is called on to produce this letter of February 5th and it is not produced. Warterfield says his letters were written in long hand

and he therefore had no carbon copy. Just at this point in the conflict of testimony, the failure to produce this letter, must weigh against the complainant.

W. E. Hudgins represented the Union Joint Stock Land Bank in making the loan attacked in this suit. Of course it was understood between him and Warterfield that the Land Bank was to have a first lien and the lien to secure the ten notes on the land must be released. He saw the release made by Warterfield on the margin in tht Register's Office. He says Warterfield had the notes. That he cannot say that he counted them, but he was satisfied that Warterfield had the ten Wade notes. That he could not have mistaken the three first notes from the Union City Bank for the whole ten. This is certainly to some extent, at least, corroborative testimony to that of Warterfield. The only circumstance to support the testimony of Alexander is that the records of the bank contain no receipt for the notes from Warterfield. We are satisfied that Alexander acting for the bank sometimes allowed Warterfield to take collateral from the bank without requiring him to give a receipt. A letter of January 15, 1923, from Alexander to Warterfield reads thus:

"We are in receipt of yours of Jan. 13 and note prospects are favorable for you to close up one or two of the trades this week. Will appreciate your getting all these matters straightened out as soon as possible, and understand that you are holding the notes which we sent you some days ago in trust for our account.

"Will thank you to keep us posted, and with kind personal regards, beg to remain,

"Yours very truly,

"V. J. Alexander, Vice-President & Cashier."

This indicates that certain notes were sent to Warterfield without requiring a receipt. It is not contended that the notes referred to had anything to do with this case, but it at least indicates that Warterfield was entrusted by the bank with some notes belonging to the bank for which the bank held no receipt. Then the fact that the bank did not produce the Warterfield letter of February 5, 1926, we suppose indicates that it could not be found and this indicates that the bank's records are not perfectly kept even as to recent papers.

There is some attempt to impair the testimony of Warterfield by Wakefield, but we think Wakefield only destroys himself. His testimony is not at all convincing. He says Warterfield claimed to have spent the $5,000 borrowed from the Union Joint Stock Land Bank to better the condition of the farm. He also says that Warterfield ran to give him a deed to the Wade land after he got on the

train, which he refused to receive, when no deed to the Wade land had been executed. He also speaks of Warterfield using the insurance money from the Wade place when there was no insurance. He speaks of himself as the discoverer of the Kirkman release and mortgage when the bank had the deed months before which showed this. He says Warterfield told him there was nothing on the land but their notes. How did he think the prior liens had been removed? Then he says Warterfield denied making the release of the liens of the notes. He knows so little about the matters involved in the case and is so inaccurate where this is manifest, that when he differs with Warterfield, we will take the latter's version of what took place in preference to his.

There is another view of this controversy which we think is entitled to weight. It is evident from the testimony of Alexander that what he claims to have discovered or that Wakefield discovered, was not that Warterfield had released the liens and borrowed money to stop foreclosures, but that what had been done did not turn out for the benefit of the American National Bank. When Wakefield first wrote to the Union Joint Stock Land Bank he claimed that the release of the lien of the Kirkman notes was void also, but afterwards, complainant reached the conclusion that it had received about the maximum benefit from this loan and concluded to forgive the fraud. The complainant bank could not authorize Warterfield to do what was necessary to borrow money to save the property from foreclosure, leave the matter to him and then repudiate the claim of the lender of the money, because the result was not as satisfactory as expected. Even if the release of the lien of complainant's seven notes was void, it was error to decree that proceeds of sale after paying the amount of the Stalcup note, taxes, etc. should be prorated as $2493.34 is to $16,664.32. It should be as three notes to seven notes, or 3/10 to 7/10. The Stalcup note, taxes, etc. was so much to be deducted from the value of the land. Suppose there had been a sale by the Third National Bank of Union City to satisfy the $2500 note. Suppose then the property had brought $10,000 over and above the Stalcup note, taxes, etc. How would it have been prorated? The Stalcup note and taxes would have been paid first. Then the parties would be entitled to share according to their security, one party having 3/10 of the security and the other 7/10, they should share accordingly. Three notes being hypothecated with the Third National Bank and the Union Joint Stock Land Bank having furnished the money to take up this debt, is subrogated to the security, that is, 3/10 of the whole. It is not as if the two debts were equally secured by the same property. In that case the proceeds of the property should be prorated according to the debts, but here, three

notes were pledged to secure the smaller debt and seven notes to secure the larger. When the $2500 debt was paid, the three notes were released and the complainant bank had no claim on them. In 1923 it may be safely assumed that this Wade land was worth at least $10,000 over and above the Stalcup note and taxes. It had sold in 1920 for much more and in May, 1923, secured a loan of $5,000. Taking then the value to be $10,000, $3,000 of this would follow the three notes held by the Third National Bank and $7,000 the seven notes held by the complainant. When therefore, the $5,000 loan from the Union Joint Stock Land Bank paid off the first two notes and Warterfield agreed to turn over the third note to complainant, the security of the complainant was increased at least $3,000 by this part of the transaction, which with the Stalcup note and taxes would give complainant nearly if not quite full consideration for the $5,000 loan on the land. So that rightly considered even the dissatisfaction to complainant was without a sound basis. There was really no more cause for complaint in case of the Wade land than in that of the Kirkman land. In both cases Warterfield had done very well for the complainant.

The proof was taken in this case in 1928. The transactions as to which the witnesses testified began in 1920. There was time for dimness of recollection. The court may take judicial notice of certain matters of history which have a bearing on this controversy. In 1920 farm lands were on a boom. By 1923 the crest of this inflation had passed, but there was still room for optimism to hope for a come-back. Alexander says Warterfield was an optimist. As we see it, he wanted to do the best he could for the complainant bank and look out for his own interest at the same time. He did not want the land sold under foreclosure on a depressed market. Foreclosure was threatened. He consulted Alexander and Alexander confessedly not having a very clear idea of the land situation in Obion County, left the matter to the judgment of Warterfield, agreed to his plan and trusted him to work it out. Warterfield did what he thought best for the interests of complainant. Time wore on and the situation became worse instead of better. Wade and Kirkman threw up their hands and quit. The bank examiners found a lot of dead paper in complainant's bank. Alexander was urging Warterfield to do something and Warterfield, his optimism dampened but not extinguished, was promising. Then in May, 1926, the bank sent Wakefield to Union City to investigate and he, knowing nothing about what had transpired between Alexander and Warterfield, began to discover things which Alexander in a vague way had known about. Wakefield was prejudiced against Warterfield, because he thought he had got the bank's interest in this matter in bad shape, causing criticism. Alexander remember-

ing vaguely, and feeling that he had not done as well as he might have done in the matter, perhaps criticised by those who did not understand the situation clearly, was willing to turn the matter over to Wakefield and Wakefield writes the letter of June 14, 1926, to the Union Joint Stock Land Bank, saying that the American National Bank had just discovered what Warterfield had done in 1923 in regard to both the Wade and Kirkman land, that the act of Warterfield was without authority and that the American Bank would insist in both cases in having its liens declared prior to those of the Union Joint Stock Land Bank. This letter shows ignorance of the whole transaction. It states as just discovered, what Alexander had known, even if he had forgotten. It ignores the liens on the two farms, prior to the liens of the American Bank. It ignores the threatened foreclosures and the full advantage received by complainant. The whole letter shows that the writer did not understand what he was writing about. Upon further consideration, the complainant concluded that it had received full consideration in the loan on the Kirkman land and dropped that contention. If it had considered the loan on the Wade land correctly, it should have concluded that it was not injured by the loan on that land. It may be that Warterfield used between $300 and $400 of the $5,000 loan on the Wade land to pay interest on the first notes to himself. It is also true that the three notes held by the Union City Bank were not a prior lien, but only equal with that of the seven notes held by complainant, still the fact remains, that the elimination of these three notes with the other payments of liens admittedly prior to the seven notes, left the security of complainant unimpaired in May, 1923. If the land had increased in value, complainant would have been better off by virtue of the loans. That the land did not increase in value does not justify the complainant in repudiating the express or implied authority of Warterfield. There is no question but that the Union Joint Stock Land Bank acted in perfect good faith. If then, its loan was caused even by "the neglect in caution, credulity or misplaced confidence" of the complainant bank, then it is bound by the loan. Early v. Williams, 135 Tenn., 259; 2 Jones on Mortgages (7 Ed.), 967.

There is an attempt to make something against defendants out of the fact that after Wakefield took charge of the matter, Warterfield proposed to pay $1800 to satisfy complainant and prevent this suit. It is argued that this is an admission by Warterfield that he was not authorized to do what he did. We do not so consider it. Warterfield owed complainant more than $1800. If we understand him rightly, he would have been glad to pay his whole debt to complainant. If he could by paying $1800 on his debt prevent

this suit against the bank that had made the loans in 1923, we can understand how he would be glad to do so. If he had the authority of Alexander to negotiate the loans, and we think he had, no compromise he could make or offer would affect the right of the Union Joint Stock Land Bank.

For the reasons given, the decree must be reversed. We hold that the mortgage of the Union Joint Stock Land Bank for $5,000 is a first lien on the land. Both parties ask a sale, so the cause will be remanded to the Chancery Court of Obion County to be further proceeded with. The trust deed of the Union Joint Stock Land Bank provides for reasonable attorney's fees in case of necessary litigation, but this was not acted upon by the Chancellor and as the case must be remanded, this question can be taken up when decree of sale is entered. The sale will be by the Master, therefore there should be no question of compensation to the trustee for making the sale. We leave the time and terms of sale to the Chancellor. The complainant will pay the costs of both courts.

Owen and Senter, JJ., concur.